

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **TINA JONES and BOBBIE SIMMONS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:21-cv-659-AMM** |
| **ALFA MUTUAL INSURANCE COMPANY,** | ) ) ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

This case is before the court on a motion for summary judgment by defendant Alfa Mutual Insurance Company ("Alfa"). Doc. 58. For the reasons explained below, the motion is **GRANTED**.

## I.    BACKGROUND

Facts set forth in the parties' statement of material undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party.[1] *See* Doc. 12 at 18–19. These are the

---

[1] In their response opposing summary judgment, the plaintiffs state that they "dispute all of [Alfa's] facts as written." Doc. 66 at 4. Under applicable law, the plaintiffs cannot rely on this blanket assertion, so the court's recitation of the facts reflects specific disputes. *See* Fed. R. Civ. P. 56(c)(1), (e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

undisputed material facts construed in the light most favorable to plaintiffs Tina Jones and Bobbie Simmons, and those disputed by Alfa but construed against it for purposes of its summary judgment motion:

### A.    Alfa and Its Pension Plan

Alfa is an insurance company. Doc. 59-1 at 7, Dep. 21:14–20; Doc. 59-4 at 6. Alfa maintains a benefit pension plan (the "Plan") for some of its employees. *See* Doc. 59-5 at 20. According to Alfa, the Plan was frozen at the end of 2010, and thus employees who Alfa hired beginning in 2011 could not participate in the Plan. Doc. 59-17 at 10, Dep. 30:12–31:5; Doc. 59-11 at 17, Dep. 59:1–11. According to the plaintiffs, Alfa froze the Plan at the end of 2009. Doc. 59-23 at 27, Dep. 100:18–20. In any event, Alfa "grandfathered[-]in" eligible employees who were employed before the freeze, and Alfa continued to contribute to the Plan on their behalf. *See* Doc. 59-11 at 17, Dep. 59:12–14.

The Plan operates using a "Rule of 90." Doc. 59-17 at 9, Dep. 26:23–27:12. The Rule of 90 means that a Plan participant is eligible to retire and receive full benefits when his or her age plus his or her years of service add up to 90. *Id.* Employes can accrue up to a maximum of 35 years of service credit for Plan benefits. Doc. 59-9 at 11.

**B.    The Plaintiffs' Employment with Alfa**

Ms. Simmons and Ms. Jones began working for Alfa in 1985 and 1990, respectively. Doc. 59-11 at 8, Dep. 23:14–16; Doc. 59-2 at 6, Dep. 17:16–18. Both plaintiffs worked as assistant underwriters in the Homeowner Division of Alfa's Field Services Department at all times relevant to this lawsuit. Doc. 59-11 at 9, Dep. 27:3–20; Doc. 59-2 at 7, Dep. 20:11–21:9; *id.* at 11, Doc. 35:21–36:1. Ms. Jones was 49 and Ms. Simmons was 54 when the events relevant to this case took place. Doc 59-2 at 15, Dep. 50:2–7; Doc. 59-11 at 12, Dep. 39:2–5. Both plaintiffs were Plan participants and eligible for the Rule of 90 benefit. Doc. 65-16 ¶ 7; Doc. 65-17 ¶ 8. In August of 2019, Ms. Simmons was approximately one year and ten months away from full retirement benefits, and Ms. Jones was five or six years away. Doc. 65-16 ¶ 9; Doc. 65-17 ¶ 8.

Underwriters in the Field Services Department physically inspect homes to evaluate risk and identify changes that are necessary for Alfa to continue existing insurance policies. *See* Doc. 59-2 at 10, Dep. 30:18–31:18; Doc. 59-11 at 11, Dep. 34:21–35:23. As assistant underwriters, the plaintiffs "would do follow-ups from underwriting work." Doc. 59-2 at 7, Dep. 21:10–20. These duties included "address changes," *id.*, Dep. 21:22–23; "updates," *id.* at 8, Dep. 22:6–12; and "process[ing] any changes that may be needed on the policies," Doc. 59-35 at 10, Dep. 31:17–32:1. The plaintiffs also performed CPS tasks, which Ms. Jones could not exactly

3

describe, but she did testify that CPS tasks involved "double-checking someone else's math." Doc. 59-2 at 10–11, Dep. 33:1–34:10.

Both plaintiffs reported to Elanda Burkett—the head of the Field Services Department—at the times relevant to this lawsuit. *Id.* at 17, Dep. 60:19–22; Doc. 59-11 at 10, Dep. 31:12–16. Pamela Betts, Jackie Perkins, Michelle Everage, and Paula Noles were also assistant underwriters during the relevant period. Doc. 59-38 at 2. These four employees reported to Ms. Burkett, but they "did not do . . . CPS." Doc. 59-2 at 11, Dep. 36:21–37:6.

### C.   Guidewire

Sometime around 2018, Alfa started using Guidewire—a new computer software. Doc. 59-2 at 13, Dep. 45:2–14. Alfa introduced Guidewire to the Field Services Department around 2018. *Id.*; Doc. 59-11 at 10, Dep. 33:4–17. Guidewire "automate[d] some of the underwriting processes," and "overtook some of the underwriting positions," specifically "[a]ssistant underwriters and underwriters." Doc. 59-35 at 14, Dep. 46:3–47:7.

 According to the plaintiffs, Alfa provided "more training" "on the Guidewire system" to younger employees than to older employees. Doc. 59-2 at 26, Dep. 95:18–96:2. In her deposition, Ms. Jones stated that she complained to Ms. Burkett "on at least a monthly basis that she and other older workers needed to be trained" on "conversion." *Id.* at 15, Dep. 52:1–14. According to Ms. Simmons, all complaints

were verbal and were not made in writing. Doc. 59-11 at 13, Dep. 45:3–14. By "conversion," Ms. Jones explained that meant "rolling over the business from the old system to the new system." Doc. 59-2 at 15, Dep. 52:15–18. Conversion was not part of Ms. Jones's or Ms. Simmons's job duties. *Id.*, Dep. 53:1–13; *see also* Doc. 59-11 at 11–12, Dep. 37:23–38:14. Rex Seabrook, then–Vice President of Property and Commercial Underwriting, testified that it was not necessary to train all assistant writers for conversion because it was "a very temporary need." Doc. 59-35 at 7–8, Dep. 21:21–22:1; *id.* at 26, Dep. 96:9–97:10.

Ms. Jones identified Ms. Perkins, Ms. Everage, and Ms. Noles as younger workers who received adequate training, Doc. 59-2 at 13, Dep. 44:10–45:1; *id.* at 15, Dep. 50:8–53:13, and Ms. Simmons identified Ms. Noles and Ms. Everage, Doc. 59-11 at 12, Dep. 38:2–21. Alfa points out that at the relevant time, "none of these women were under 40: [Ms.] Noles was 47, [Ms.] Everage was 51, and [Ms.] Perkins was 54." Doc. 60 at 10; Doc. 59-38 at 2; Doc. 59-2 at 15, Dep. 50:14–51:23. The plaintiffs dispute this alleged fact as "immaterial" on the basis that "it does not matter whether comparators are under 40 or not." Doc. 66 at 5. Ms. Noles and Ms. Perkins both participated in the Plan. Doc. 59-40 at 3.

According to the plaintiffs, Alfa trained other younger employees in other departments, but the plaintiffs could not identify those specific employees by name. Doc. 59-2 at 27, Dep. 99:5–100:15; Doc. 59-11 at 12, Dep. 39:13–40:22. The

plaintiffs say that Ms. Simmons testified that Alfa treated younger Field Services Department employees more favorably than it treated her. Doc. 59-11 at 13, Dep. 43:15–44:4.

Ms. Jones testified that due to their complaints, Alfa management became "dismissive," "wouldn't acknowledge [their] complaints," and treated them "like [they] didn't exist." Doc. 59-2 at 16, Dep. 54:3–13. Ms. Simmons testified that after her complaints, she was "moved away from the other underwriting assistants" and had her "personal article floater duties . . . taken away." Doc. 59-11 at 26, Dep. 95:17–96:17. Ms. Simmons further testified that Mr. Seabrook "did not want to give the personal article floaters back to us." *Id.*, Dep. 96:20–22. Ms. Simmons testified that she kept the same job title and reported to the same supervisor. *Id.*, Dep. 96:10–14.

### D.    Alfa's Reduction in Force

In October 2019, Alfa eliminated its Field Services Department to reduce costs. Doc. 59-1 at 24, Dep. 87:12–14; Doc. 59-2 at 17, Dep. 61:13–17; Doc. 59-11 at 18, Dep. 65:9–21; Doc. 59-35 at 11, Dep. 34:13–15. According to Alfa, this eliminated both of the plaintiffs' positions, and no one replaced those positions. Doc. 59-7 at 25; Doc. 59-13 at 12; Doc. 59-2 at 20, Dep. 71:15–18; Doc. 59-11 at 25, Dep. 93:4–22. The plaintiffs dispute that the statement that they were not replaced because

"their duties and responsibilities were given to younger employees a few months after [their] termination." Doc. 66 at 5; Doc. 65-17 ¶ 15.

Beth Chancey—Senior Vice President of Property & Casualty Operations—and Mr. Seabrook "made the decision to eliminate the Field Services department and reported the decision to Tommy Coshatt"—Executive Vice President of Operations—"who approved it." Doc. 60 at 12; Doc. 59-1 at 9, Dep. 27:11–14; Doc. 59-39 at 8, Dep. 23:22–24:3; *id.* at 25, Dep. 91:1–92:3; Doc. 59-23 at 10, Dep. 31:17–22; *id.* at 11, Dep. 35:14–36:13; Doc. 59-37 at 11. As to the chain of command, Mr. Seabrook reported to Ms. Chancey, and she reported to Mr. Coshatt. Doc. 59-1 at 9, Dep. 27:11–28:3; *id.* at 10, Dep. 30:2–17. In October 2019, Mr. Seabrook was 50, Ms. Chancey was 57, and Mr. Coshatt was 45. Doc. 59-40 at 3; Doc. 59-39 at 4, Dep. 8:8–14. Mr. Seabrook, Ms. Chancey, and Mr. Coshatt all participated in the Plan. Doc. 59-35 at 9, Dep. 29:18–20; Doc. 59-1 at 25, Dep. 91:7–9; Doc. 59-39 at 11, Dep. 34:3–4.

The decision to eliminate the Field Services department came in the wake of Alfa's President "direct[ing] all Senior Vice Presidents to reduce expenses in their areas." Doc. 60 at 13; Doc. 59-1 at 11–12, Dep. 37:11–39:4. After Ms. Chancey received this direction from Alfa's President, she tasked Mr. Seabrook "to come up with a plan to reduce expenses in his area." Doc. 60 at 13; Doc. 59-1 at 12, Dep. 39:14–40:15. Mr. Seabrook proposed, among other things, eliminating the Field

Services Department. Doc. 59-1 at 70–71; *id.* at 15–16, Dep. 52:14–54:17. Alfa decided to eliminate the Field Services Department because "the business need wasn't there." Doc. 59-39 at 23, Dep. 82:22–84:2.

According to Ms. Chancey, she "had no involvement whatsoever [in] choosing who[se] position to eliminate and who to terminate," and presented the plan to Mr. Coshatt. Doc. 59-1 at 30–31, Dep. 113:23–114:14. Mr. Coshatt testified that he "was not involved in . . . detailed analysis in looking at who was going to do what, and what positions were eliminated" and instead "just asked for high-level information." Doc. 59-39 at 20, Dep. 73:3–11; *id.* at 24, Dep. 87:2–8. Mr. Coshatt also testified that "pensions are . . . a very expensive benefit for companies." *Id.* at 11, Dep. 35:18–37:6. The plaintiffs dispute Mr. Coshatt's account, saying that he "was involved but chose not to do anything to save" their jobs. Doc. 66 at 5.

On September 20, 2019, Ms. Chancey sent an email to Mr. Seabrook informing him that a position was "coming open" in the Life department. Doc. 65-24 at 1. She asked whether "any of those that we [were] discussing eliminating their job qualif[ied] for this position." *Id.* Mr. Seabrook responded that "Tina Jones (college degree holder), Pam Betts, and Bobbie Simmons all qualify." *Id.* Ms. Chancey responded, "Of the three, which do you think has the best communication skills?" *Id.* Mr. Seabrook replied, "Pam Betts is the best communicator and her husband is in the medical field with Southern Orthopedic as a Surgical Technician

so she may know some terminology." *Id.* Ms. Betts did not accept the position in the Life department. Doc. 65-1 at 19, Dep. 70:16:21. The plaintiffs allege that no one told them about the Life department position. Doc. 65-16 ¶ 14; Doc. 65-17 ¶ 16.

On October 2, 2019, Mr. Seabrook sent Ms. Chancey an email titled "Fwd: Years of Service." Doc. 65-21 at 1. This email included a list of employees who had achieved various milestones of service at Alfa ranging from thirty to thirty-seven years. *Id.* Both plaintiffs appeared on the list. *Id.*

When considering other open positions at Alfa, Mr. Seabrook ranked the plaintiffs "among the lowest" employees based on "[p]erformance appraisals, errors, [and] volume[] of work." Doc. 59-35 at 11, Dep. 37:10–17. Mr. Seabrook testified that "Ms. Jones was the worst communicator I've ever spoken to in an interview" and that "Ms. Simmons had a reputation in the building of being unkind to others around her." Doc. 59-35 at 25–26; Dep. 93:7–94:9. Alfa considered the plaintiffs for open positions, Doc. 59-23 at 20, Dep. 71:15–73:19, but at the time of their termination, there were no longer any positions available for transfer, Doc. 59-35 at 12, Dep. 40:10–14. The plaintiffs dispute this statement and say that there were at least two open positions that they could have filled, but Mr. Seabrook attempted to place a younger employee—Ms. Betts—into both of those roles. *See* Doc. 65-24 at 1; Doc. 65-25 at 2–3. Mr. Seabrook testified that he did not consider "demographics, benefits . . . or . . . participa[tion] in the pension plan" in the decision-making process.

9

Doc. 59-35 at 22, Dep. 78:5–16. The plaintiffs dispute that statement because "one would only need years of service[,] age of the employee[,] and earnings to gauge the value of a pension as those are its main drivers." Doc. 66 at 5; Doc. 59-17 at 9, Dep. 26:3–11.

Alfa terminated the plaintiffs on October 22, 2019. Doc. 59-22 at 2–3. No one mentioned age during the termination meeting. Doc. 59-2 at 18, Dep. 65:15–20; Doc. 59-11 at 18–19, Dep. 65:22–66:10. And Alfa did not terminate the plaintiffs due to "performance reasons" or violating any "conduct rule[s]." Doc. 59-23 at 14, Dep. 47:16–22. During her meeting, Ms. Simmons asked if Alfa could transfer her to another department, and Mr. Seabrook told her that she "could apply for a  job if one became available." Doc. 59-11 at 18, Dep. 62:22–63:3. Neither plaintiff applied for another job with Alfa. Doc. 59-2 at 23, Dep. 83:13–85:16; Doc. 59-11 at 18, Dep. 64:20–65:3. The plaintiffs assert that they believed that applying for another job would have been futile. *See* Doc. 65-16 ¶ 14; Doc. 65-17 ¶ 16.

E.    **Procedural History**

The plaintiffs filed this lawsuit in May 2021. Doc. 1. Alfa moved for summary judgment on all claims in December 2023. Doc. 58. That motion is fully briefed. Docs. 60, 66, 69. The plaintiffs moved for leave to file a sur-reply, Doc. 70, and that motion is **GRANTED**. The court also considered Alfa's opposition brief to the sur-reply, Doc. 71, and the plaintiffs' sur-sur-reply, Doc. 72.

## II.  LEGAL STANDARDS

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up). In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.  ANALYSIS

The plaintiffs assert four claims against Alfa. Counts I and II are claims of discrimination and retaliation under the Age Discrimination in Employment Act (the "ADEA"). Counts III and IV are claims under Section 510 of the Employee Retirement Income Security Act ("ERISA").

11

## A.    The ADEA Claims

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). "Unlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.* at 174. The ADEA requires the plaintiff to establish "that age was the 'but-for' cause of the challenged adverse employment action." *Id.* at 180.

What a plaintiff must prove to establish a prima facie case under the ADEA depends on whether the court uses the standard test or a special test for reduction-in-force ("RIF") cases. *See Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1271 (11th Cir. 2014). "Whether the standard version or the RIF version of the ADEA prima facie case applies depends on [the plaintiff's] ability to present sufficient evidence that he was replaced by a younger individual." *Id.* "A plaintiff may demonstrate that he was replaced by showing that, after his termination, some of his former responsibilities were delegated to another employee, in addition to that other

employee's own responsibilities." *Id.* The plaintiffs encourage the court to use the standard test, *see* Doc. 66 at 18–20, while Alfa argues that the court should employ the RIF test, *see* Doc. 60 at 22–23.

Viewing the evidence in the light most favorable to the plaintiffs, Alfa delegated at least some of their responsibilities to other employees in addition to those employees' own responsibilities, and therefore Alfa replaced them. For example, Ms. Simmons testified that after her termination, Alfa delegated address changes to Ms. Betts. Doc. 59-11 at 25, Dep. 92:19–93:3. Ms. Simmons also stated that after her termination, she "found out that [her] responsibilities were given to younger employees." Doc. 65-17 ¶ 15. The same goes for Ms. Jones. Doc. 65-16 ¶ 13. Therefore, the court will use the standard test for its ADEA analysis.

When an ADEA claim is based on circumstantial evidence, as in this case, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Liebman v. Met. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). "Initially, the plaintiff must establish a *prima facie* case of discrimination." *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003) (cleaned up). "The employer then must respond with a legitimate, nondiscriminatory reason for its actions." *Id.* (cleaned up). "In order to prevail, the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination." *Id.* (cleaned up).

Because the employer's intermediate burden is "merely one of production . . . it need not persuade the court that it was actually motivated by the proffered reasons." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (cleaned up). "A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence." *Tex. Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 255 n.10 (1981). The plaintiff's burden of establishing pretext "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. "To show pretext, [a plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (cleaned up).

The *McDonnell Douglas* "framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* (cleaned up). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing

mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (cleaned up).

### 1.     Count I: ADEA Discrimination

#### a.     *McDonnell Douglas*

To make a *prima facie* case of age discrimination based on discharge, the employee must show that "[she] was a member of the protected group between the age of forty and seventy" at the time of the discharge, that "a substantially younger person filled the position from which [she] was discharged," and that she was "qualified to do the job from which [she] was discharged." *Liebman*, 808 F.3d at 1298 "[I]f a plaintiff has enjoyed a long tenure at a certain position, [the court] can infer that he or she is qualified to hold that particular position." *Id*. at 1299 (cleaned up).

Alfa concedes that the plaintiffs are members of the protected group. Doc. 60 at 23. Alfa does not contest the other elements of the *prima facie* case because it maintains that the court should use the RIF test. *See id.* at 22–25; Doc. 69 at 8–10. Although the plaintiffs argue that the court should use the standard *prima facie* test, they do not explain how their evidence satisfies that test. *See* Doc. 66 at 18–20.

In any event, the plaintiffs' evidence presents a *prima facie* case of age discrimination. The plaintiffs belong to the protected category; Ms. Jones was 49 and Ms. Simmons was 54 when Alfa terminated them. Doc 59-2 at 15, Dep. 50:2–7;

Doc. 59-11 at 12, Dep. 39:2–5. The plaintiffs state in their affidavits that their responsibilities were given to younger employees, which resulted in those employees being "overworked." Doc. 65-16 ¶ 13; Doc. 65-17 ¶ 15. Further, both plaintiffs had enjoyed a long tenure in their current positions, so the court can infer that they were qualified to hold those positions. *See* Doc. 59-2 at 7, Dep. 20:11–21:1; Doc. 59-11 at 9, Dep. 26:12–29:21.

Alfa responds to the plaintiffs' *prima facie* case with an asserted legitimate, nondiscriminatory reason for its actions: "a cost-based reduction-in-force that led to the elimination of [the plaintiffs'] jobs and entire department." Doc. 60 at 27. Alfa's proffered explanation clears the "exceedingly light" burden required at this stage. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (cleaned up).

Thus, the burden shifts back to the plaintiffs to show that Alfa's explanation is pretextual, and that intentional discrimination was the real reason for Alfa's actions. The plaintiffs attempt to prove pretext by showing alleged inconsistencies in Mr. Seabrook's testimony, Ms. Chancey's testimony, and by comparing this case to a recent unpublished Eleventh Circuit decision, *Gargett v. Florida Department of Juvenile Justice*, No. 21-13430, 2023 WL 8706076 (11th Cir. Dec. 18, 2023).

First, the plaintiffs contend that Mr. Seabrook's articulated reason for the plaintiffs' termination "served as a mask for discrimination." Doc. 66 at 24. They argue that Mr. Seabrook's statement that Ms. Jones and Ms. Simmons were "ranked

among the lowest" assistant underwriters conflicts with his later statement that Ms. Jones's and Ms. Simmons's work product "met standards" and that there were "no problems with their evaluations." Doc. 65-1 at 10, Dep. 37:10–14; *id.* at 10–11, Dep. 37:18–38:3; *id.* at 15, Dep. 55:19–56:16. The plaintiffs also cite Mr. Seabrook's reasoning for ranking the plaintiffs lower than their counterparts, which was that "[s]ome" of the other assistant underwriters "had past experience in other roles." *Id.* at 11, Dep. 39:4–9. Mr. Seabrook said that he was not aware about Ms. Simmons's experience in the Life Department. *Id.*, Dep. 39:10–14.

None of these supposed contradictions demonstrate that Mr. Seabrook "did not honestly believe the facts upon which he allegedly based his non-discriminatory decision." *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002). At the outset, Mr. Seabrook's testimony regarding the plaintiffs' ranking among their peers does not contradict his testimony regarding them meeting standards and having no issues with their evaluations. Supervisors may rank some employees above others while acknowledging that all employees meet basic expectations. And Mr. Seabrook's critiques of the plaintiffs later was subjective: he stated that "Ms. Jones was the worst communicator I've ever spoken to in an interview" and that "Ms. Simmons had a reputation in the building of being unkind to others around her." Doc. 59-35 at 25–26, Dep. 93:7–94:9. These are not objective statements about expectations and do not support an inference against Alfa. *See Denney v. City of*

*Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001) ("[A]n employer's use of subjective factors in making a hiring or promotion decision does not raise a red flag.").

The plaintiffs contend that Mr. Seabrook's recommendation of Ms. Betts for an open position shows that Alfa's claim that there were no open positions at the time it terminated the plaintiffs was false. *See* Doc. 66 at 24–25. The plaintiffs cite an email from Mr. Seabrook to Ms. Chancey, which states that Ms. "Betts is the best communicator and her husband is in the medical field with Southern Orthopedic as a Surgical Technician so she may know some terminology." Doc. 65-24 at 1. When asked what made Ms. Betts "the best communicator" as between her and the plaintiffs, Mr. Seabrook responded that Ms. Betts is "more communicative." Doc. 65-1 at 17, Dep. 63:4–6. The plaintiffs say that Mr. Seabrook's cited example of Ms. Betts telling him "good morning" and the plaintiffs not doing so as an example of Ms. Betts being more communicative shows pretext. *Id.* at 17–18, Dep. 63:17–66:2.

The undisputed evidence shows that Mr. Seabrook named the plaintiffs and Ms. Betts as individuals that qualified for the open position. Doc. 59-36 at 8. And in any event, this evidence does not establish pretext. When Ms. Chancey asked Mr. Seabrook who among the three candidates had "the best communication skills," Mr. Seabrook recommended Ms. Betts. *Id.* Mr. Seabrook's subjective judgment as to who held the best communication skills does not show pretext. *See Denney*, 247 F.3d at 1186.

The same is true for Ms. Chancey's testimony. According to the plaintiffs, Ms. Chancey's testimony contradicts Mr. Seabrook because Ms. Chancey stated that Alfa terminated the plaintiffs "based on [an] analysis of their teams, and which positions needed to be eliminated." Doc. 59-1 at 21, Dep. 75:3–12. The plaintiffs say that this statement by Ms. Chancey undermines Mr. Seabrook's explanation that Alfa fired the plaintiffs' due to poor performance. *See* Doc. 66 at 22. But as Alfa points out, Ms. Chancey later clarified that Mr. Seabrook "and his team [were] looking at their staff[] and . . . if anybody could be put in other positions, and . . . those that could not." Doc. 59-1 at 21, Dep. 75:9–18. Ms. Chancey's testimony does not establish pretext concerning Mr. Seabrook's proffered reason for the plaintiffs' termination.

Further, *Gargett* is an unpublished opinion, which is "not precedential" and "do[es] not bind [the Eleventh Circuit] or district courts to any degree." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1346 (11th Cir. 2022). And it is unlike this case. In that case, a fifty-seven-year-old employee was fired and sued his former employer under the ADEA and other antidiscrimination laws. 2023 WL 8706076, at *1, *4. Although the plaintiff's supervisor recommended termination on several bases, *see id.* at *3, when she was asked in her deposition why she sought the plaintiff's termination, she stated "that she did not recall," *id.* Additionally, the plaintiff testified that same supervisor "had expressed to him a strong bias against older employees"

and "indicated that her philosophy as to employees was out with old, and in with the new." *Id.* at *2.

The district court in that case granted summary judgment on all claims, *id.* at *4, but the Eleventh Circuit reversed as to the ADEA claims, *id.* at *14. The court held that the "plaintiff has met his burden to show a jury question as to pretext." *Id.* at *9 (cleaned up). The court specifically noted the detailed explanation the supervisor provided for the plaintiff's termination in a memorandum prepared by the employer's counsel and reasoned that "one would have expected [the supervisor], when asked, to explain the specific reasons that she had for deciding that Plaintiff had to be fired." *Id.* The court also pointed out that "the official in the agency who was required to approve [the supervisor's] recommendation that Plaintiff be fired" gave a completely inconsistent explanation for the plaintiff's termination than the supervisor did. *See id.* at *10. When those inconsistencies were combined with the supervisor's alleged disparaging comments regarding older employees, the court held that was enough to create a genuine dispute of material fact. *Id.* at *11.

The genuine dispute of material fact in *Gargett* is not present here. Mr. Seabrook explained why Alfa terminated the plaintiffs in his deposition. According to his testimony, cost-cutting led to reorganization; "top performers remained, and the lowest performers were terminated." Doc. 59-35 at 11, Dep. 34:13–36:16. He stated that the plaintiffs were terminated because they were comparatively "ranked

among the lowest" employees eligible for termination. *Id.*, Dep. 37:10–14. There is no inconsistency, and there is no evidence that the plaintiffs' supervisors had expressed a strong bias against older employees, as was the case in *Gargett*.

In sum, the plaintiffs have failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (cleaned up). Accordingly, their ADEA discrimination claim cannot survive summary judgment under the *McDonnell Douglas* framework.

### b. Convincing Mosaic

"A plaintiff will always survive summary judgment if he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (cleaned up). Plaintiffs can establish a convincing mosaic "by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (cleaned up).

Alfa argues that the "plaintiffs cannot establish any convincing mosaic of discrimination." Doc. 60 at 29 (cleaned up). The plaintiffs respond that they have presented a convincing mosaic of intentional discrimination. *See* Doc. 66 at 28–29. First, they say that Alfa's "actions were extraordinarily arbitrary" because the plaintiffs' personnel files do not support Mr. Seabrook's testimony. *Id.* at 28 (cleaned up). Second, the plaintiffs argue that "substantial evidence suggest[s] that [Alfa's] stated reasons for terminating the Plaintiffs were pretextual." *Id.* at 29. Alfa replies that Mr. Seabrook did not have hiring authority for either position that the plaintiffs identified and that, in any event, Mr. Seabrook's subjective opinions fail to demonstrate pretext. *See* Doc. 69 at 17.

The plaintiffs have failed to put together a convincing mosaic of circumstantial evidence that would allow a fair-minded jury to infer that Alfa intentionally discriminated against the plaintiffs because of their age. The plaintiffs primarily rely on the same arguments and evidence they offered at the pretext stage of the *McDonnell Douglas* analysis. For the same reasons those arguments failed there, they fail here as well. And although the plaintiffs may dispute Mr. Seabrook's opinion regarding their abilities, they provide no evidentiary support to show that opinion was pretextual.

Alfa's motion for summary judgment on the plaintiffs ADEA discrimination is **GRANTED**.

### 2.     Count II: ADEA Retaliation

Courts in the Eleventh Circuit use the *McDonnell Douglas* framework to evaluate ADEA retaliation claims that are based on circumstantial evidence. *Harvey v. Walmart, Inc.*, No. 23-11213, 2024 WL 1460314, at *3 (11th Cir. Apr. 4, 2024) (citing *Chapman*, 229 F.3d at 1024). To establish "a prima facie retaliation claim under either Title VII [or] the ADEA . . . a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). ADEA retaliation claims require but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); 29 U.S.C. § 623(a), (d).

"Once a prima facie case has been established, the defendant may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). If the defendant offers a legitimate reason for the employment action, "the plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the defendant are pretextual." *Id.*

Alfa concedes for purposes of its motion for summary judgment that the plaintiffs engaged in statutorily protected express and that the plaintiffs suffered an adverse employment action. Doc. 60 at 26. But Alfa argues that the plaintiffs cannot

show a causal relationship between the plaintiffs' reports to their supervisor and their termination. *Id.* The plaintiffs respond that they can demonstrate causation, as they contend that they made repeated complaints to Ms. Burkett "that they were being treated less favorably than their younger counterparts." Doc. 66 at 31. They plaintiffs argue that Ms. Burkett relayed these comments to Mr. Seabrook, and that Alfa terminated the plaintiffs about two weeks after the last complaint. *Id.* According to the plaintiffs, the temporal proximity between the last complaint and their termination is enough to show causation. *Id.* Alfa replies that "[t]here is no reasonable causal connection between the alleged complaints and the discharge when the complaints were allegedly the same as those received for years." Doc. 69 at 10.

The plaintiffs establish a *prima facie* case by virtue of the temporal proximity between their last complaint and their termination. The Eleventh Circuit has stated that "[a] plaintiff satisfies this element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (cleaned up). According to the plaintiffs, they "complained . . . on a weekly basis" that Alfa was training younger employees and not training them in the same way. Doc. 65-16 ¶¶ 10–11; Doc. 65-17 ¶¶ 9–10. The plaintiffs say that

their complaints were relayed to the decisionmaker, Mr. Seabrook. Doc. 65-16 ¶ 11; Doc. 65-17 ¶ 10.

But temporal proximity alone is not enough. "While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc). Alfa offers the same "legitimate, nondiscriminatory reason for both Plaintiffs' discharge: a cost-based reduction-in-force that led to the elimination of their jobs and entire department." Doc. 60 at 27. The plaintiffs only address the *prima facie* case, and they do not attempt to show that Alfa's stated reason is pretextual with respect to their ADEA retaliation claim. Therefore, that claim cannot survive summary judgment, and Alfa's motion for summary judgment on that claim is **GRANTED**.

## B.   The ERISA Claims

"Section 510 of ERISA prohibits discrimination against any plan member 'for exercising any right to which he is entitled under the provisions of the employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .'" *Owens v. Storehouse, Inc.*, 984 F.2d 394, 397 (11th Cir. 1993) (quoting 29 U.S.C. § 1140). The

Eleventh Circuit has understood Section 510 to provide for two types of claims: (1) interference and (2) retaliation. *See id.* at 398.

The plaintiffs plead a Section 510 interference claim in Count III of their complaint. Doc. 1 at 10; *id.* ¶ 65 ("Defendant's actions had the intended effect of interfering with Plaintiff's attainment of pension benefits under the ERISA plan."). But Count IV is unclear. The plaintiffs style Count IV as an ERISA Section 510 "Termination" claim. *Id.* at 11. The court is unaware of any caselaw evaluating such a claim, and the plaintiffs do not cite any such authority.

Further, the allegations in Count IV reads like a retaliation claim. *Id.* ¶ 71 ("Defendant unlawfully discharged Plaintiffs in order to prevent them from exercising rights to which they were entitled under ERISA."). That is how Alfa construed the claim, *see* Doc. 60 at 30, and the plaintiffs did not argue against that construction in response, *see* Doc. 66 at 2. In the plaintiffs' sur-reply, they expressly state that they "do not press a retaliation claim." Doc. 70-1 at 2.

Accordingly, the court construes Count IV as an interference claim and evaluates Counts III and IV together.

Like the ADEA claims discussed above, "a plaintiff can establish an ERISA claim by either direct evidence or circumstantial evidence under the *McDonnell Douglas* framework." *Liebman*, 808 F.3d at 1300. A *prima facie* ERISA case requires the plaintiff to "show that he: (1) was entitled to ERISA protection; (2) was

26

qualified for his position; and (3) was discharged under circumstances that give rise to an inference of discrimination." *Id.* If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer does so, "[t]he burden then shifts back to the plaintiff to establish the employer's reason was pretext." *Id.*

### 1. Counts III & IV: Section 510 Interference

Alfa contests only the last element of the *prima facie* case. Doc. 60 at 31. According to Alfa, summary judgment is warranted on the plaintiffs' Section 510 interference claim because it did not intend to interfere with the plaintiffs' ERISA rights. *See id.* at 30. Alfa cites precedents holding that "[t]he ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993). Alfa argues that any evidence of intent is lacking in this case, *see* Doc. 60 at 31–32, and the fact that the decisionmakers also participated in the Plan would make it extremely difficult to find that they acted with intent, *see id.* at 31.

In response, the plaintiffs argue that they are not required "to show that interference with ERISA rights was the sole reason for discharge but does require plaintiff to show more than the incidental loss of benefits as a result of a discharge." *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 546 (11th Cir. 1993). In other words,

they need only show that "interference with ERISA rights was a motivating factor." *Clark*, 990 F.2d at 1224. The plaintiffs contend that at least one motivating factor behind Alfa's decision to terminate their employment was their pension benefit. Doc. 66 at 36. And the plaintiffs argue that controlling pension costs by terminating employees violates Section 510. *Id.* at 43.

On reply, Alfa directs the court's attention back to *Clark*, which provides that "[t]he plaintiff . . . cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits." *Clark*, 990 F.2d at 1224. Further, "measures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent." *Id.* According to Alfa, the plaintiffs lack evidence that any decisionmaker considered pension benefits when deciding who to terminate. *See* Doc. 69 at 22.

The plaintiffs have established a *prima facie* case of ERISA Section 510 interference. Mr. Seabrook testified that he considered "[s]alary and benefits[]" when considering cost-cutting measures. Doc. 59-35 at 12–13, Dep. 41:23–42:6. Mr. Seabrook testified that benefits included an employee's pension. *Id.* at 25, Dep. 91:10–19. Mr. Coshatt testified that "pensions are . . . a very expensive benefit for companies." Doc. 59-39 at 11–12, Dep. 35:18–38:15. In the light of the fact that Alfa was taking cost-cutting measures, the plaintiffs demonstrate a *prima facie* case that

the elimination of their pension benefits was at least a motivating factor behind Alfa's decision to terminate them.

But Alfa articulates a legitimate, nondiscriminatory reason for the plaintiffs' termination: Alfa made a "business judgment[]" that it needed to "eliminat[e] . . . the Field Services department to reduce costs." Doc. 69 at 25; Doc. 60 at 34.

And plaintiffs have not demonstrated that Alfa's stated reason for the plaintiffs' termination was pretextual. In their sur-reply, the plaintiffs speculate as to Alfa's reasons for terminating them without citing any caselaw or relevant record evidence. The plaintiffs speculate that: (1) "the biggest reason to terminate Plaintiffs instead of others was their pension costs," (2) "[e]very reason for their termination and the refusal to place them in another position can only be explained by the significant pension cost[,]" (3) Mr. Seabrook "knew that the pension was so expensive," and (4) Mr. "Coshatt knew exactly who was being terminated as [Mr.] Seabrook gave him too much information" and that "[h]e should have asked questions if he objected to [Mr.] Seabrook's plan." Doc. 70-1 at 3–4, 6.

The plaintiffs provide no evidence that "because [Mr.] Seabrook had a summary plan description as a participant, he personally made a calculation of the estimate of Plaintiffs' pensions and supposedly utilized that fact." Doc. 71-1 at 6. Nor do they cite evidence to back up their argument that "because [Mr.] Coshatt serves on the pension board, that he knew anything regarding the specific benefits

of either Plaintiff or had any information to cause him to 'ask[] questions' regarding [Mr.] Seabrook's plan." *Id.* at 6–7 (quoting Doc. 70-1 at 6). And the plaintiffs make no argument whatsoever regarding pretext in their sur-sur-reply. *See* Doc. 72. Speculation is not evidence and cannot establish pretext.

Because the plaintiffs have failed to demonstrate that the reason given by Alfa was pretext for discrimination, Alfa's motion for summary judgment on the ERISA Section 510 interference claim is **GRANTED**.

## IV.   CONCLUSION

The court **GRANTS** Alfa's motion for summary judgment. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 26th day of August, 2024.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE